*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
August 13, 2020

Plaintiff-Appellee,

v

No. 346586
Genesee Circuit Court
LC No. 17-040823-FC

DEQUAVION DELMARCO HARRIS,

Defendant-Appellant.

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

No. 346587
Genesee Circuit Court
LC No. 17-040829-FC

KEMO KNICOMBI PARKS,

Defendant-Appellant.

Before: MURRAY, C.J., and CAVANAGH and SWARTZLE, JJ.

PER CURIAM.

These are consolidated cases.[1] Defendants were tried jointly before separate juries for shooting and killing a man in the parking lot of a convenience store. In Docket No. 346586, the jury found defendant Dequavion Delmarco Harris guilty of first-degree premeditated murder, MCL 750.316(1)(a), carrying a concealed pistol, MCL 750.227(2), and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. In Docket No. 346587, the jury found defendant Kemo Knicombi Parks guilty of first-degree premeditated murder, carrying a concealed pistol, and felony-firearm. The trial court sentenced both defendants to serve terms

---

[1] *People v Harris*, unpublished order of the Court of Appeals, entered March 31, 2020 (Docket Nos. 346586; 346587).

-1-

of life in prison without the possibility of parole for their first-degree-murder convictions, two to six years in prison for their concealed-weapon convictions, and two consecutive years in prison for their felony-firearm convictions. Both defendants appeal by right and advance a myriad of challenges. We remand in Docket No. 346587 for the sole purpose of redetermining a portion of Parks's restitution order. In all other respects, we affirm.

## I. BACKGROUND

On October 5, 2016, the victim, often referred to by his nickname "Kee-Kee," was shot and killed in the parking lot of a convenience store. The victim was in his red truck, parked in a parking space, while his friend went inside a store referred to as the "Kingwater Market." Harris, Parks, and several others arrived at the store in a car and parked next to the victim's truck. The driver of the vehicle containing Harris and Parks, Deantanea Ratcliff, testified that Harris specifically told her to go to the store where the shooting occurred, instead of a closer store. Harris and Parks were seated in the backseat of Ratcliff's vehicle, and they remained in the car while another occupant, Malik Fordham, went into the store.

Ratcliff testified that Harris and Parks spoke to each other in low voices and whispers, and that she saw Parks pass a gun to Harris. At this point, Harris and Parks left the car and, while doing so, Harris told Ratcliff, "[W]hen we get out pull off." Ratcliff left the parking lot of the Kingwater Market, with Laniya Sublett in the front-passenger seat, and drove to a nearby parking lot to wait and see whether Harris, Parks, and Fordham needed a ride home.

Witnesses saw Parks enter the store. A store employee, Danny Gordon, saw Harris briefly enter the store wearing a mask, look around, and then return to the parking lot. Several witnesses in the store heard gunshots coming from the parking lot, and both Ratcliff and Sublett heard these gunshots as well. Sublett testified that, from her position in the nearby parking lot, she saw Harris with his arm up and extended toward the red truck as gunshots rang out. Another witness, Charles Weston, saw a person wearing a mask with his arm up and extended toward the truck as he heard the gunshots ring out. One of the police detectives testified that the ammunition recovered from the parking lot was .25 caliber and that this fit a very small type of handgun that can fit in the palm of one's hand.

Sublett and Ratcliff both saw Harris run away from the parking lot and across the street, after they heard the gunshots. Sublett testified further that she then saw the red truck flee the parking lot and crash into a tree off the main road. Police and other emergency responders arrived at the scene and transported the victim to the hospital, but he was pronounced dead on arrival, having suffered five gunshot wounds.

After the shooting, police recovered several text messages exchanged between Harris's phone and a phone belonging to Makala Blair. On the morning of the shooting, Harris texted Blair and asked her to bring him ammunition, and further text messages indicated that Blair did so. Shortly after the shooting occurred, Blair asked Harris about the shooting, and Harris told Blair to "see if Kee-Kee straight." At trial, Blair testified about a feud between Harris and the victim and suggested that the murder had probably been in retaliation for the prior murder of Harris's cousin, Dominique Fuller.

After he was incarcerated, police found rap lyrics in Harris's jail cell. Deputy Mark Wing testified that he found the lyrics in a box that was near Harris's bed, and Harris identified the box as belonging to him. The trial court allowed the prosecutor to admit these lyrics into evidence.

At trial, the prosecutor's theory was that Harris and Parks planned to murder the victim in retaliation for the prior murder of Harris's cousin, Fuller, because the victim in this case was suspected of being involved in Fuller's murder. The prosecutor did not allege that Parks shot the victim, but charged him with first-degree-premeditated murder based on a theory of aiding and abetting Harris.

The jury convicted defendants on all counts. These appeals followed.

## II. ANALYSIS

## A. DOCKET NO. 346586

In Docket No. 346586, Harris argues that the evidence presented at trial was insufficient for a jury to find the element of premeditation necessary to support his conviction of first-degree premeditated murder. He further contends that the trial court abused its discretion when it admitted into evidence lyrics found in his jail cell, and argues that the erroneously admitted evidence improperly prejudiced the jury against him. We address each argument in turn.

## 1. SUFFICIENCY OF THE EVIDENCE

This Court reviews de novo a claim that the evidence was insufficient to support a criminal conviction. *People v Solmonson*, 261 Mich App 657, 661; 683 NW2d 761 (2004). This Court must view the evidence in a light most favorable to the prosecutor and determine whether a rational trier of fact could have found all the elements of the offense proved beyond a reasonable doubt. *Id*. The elements of the offense may be proven by circumstantial evidence and reasonable inferences therefrom. *Id*. Although inferences may not be based upon mere speculation, *People v Lane*, 308 Mich App 38, 59; 862 NW2d 446 (2014), "this Court must make all reasonable inferences and resolve all credibility conflicts in favor of the jury verdict," *Solmonson*, 261 Mich App at 661. Finally, all factual conflicts must be viewed in a light favorable to the prosecutor. *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748, amended 441 Mich 1201 (1992).

The offense of first-degree murder is described in MCL 750.316, which provides in relevant part:

> (1) Except as provided in sections 25 and 25a of chapter IX of the code of criminal procedure, 1927 PA 175, MCL 769.25 and 769.25a, a person who commits any of the following is guilty of first degree murder and shall be punished by imprisonment for life without eligibility for parole:
>
> (a) Murder perpetrated by means of poison, lying in wait, or *any other willful, deliberate, and premeditated killing*. [Emphasis added.]

The terms "willful," "deliberate," and "premeditated" are not defined within the statute. Michigan appellate courts have "recognized the ordinary meaning of the distinct and separate terms as the following: 'to premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem.' " *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018) (cleaned up). Our Supreme Court explained that, although

> the statute may be clear on its face that premeditation and deliberation are separate elements, a rigid and mechanical application is often difficult because the same facts may tend to establish each element, and they are subjective factors usually incapable of direct proof absent an admission or confession by the defendant. [*Id*. at 240-241.]

" 'The real focus of first-degree murder jurisprudence in Michigan has been on the kind of evidence which permits an inference of premeditation and deliberation,' and that inference may be established 'from *all* the facts of the case.' " *Id*. at 242 (citation omitted).

"Premeditation and deliberation may be established by an interval of time between the initial homicidal thought and ultimate action, which would allow a reasonable person time to subject the nature of his or her action to a 'second look.' " *Id*. (citations omitted). "[S]ome time span between the initial homicidal intent and ultimate action is necessary to establish premeditation and deliberation." *Id*. (cleaned up). There is no minimum time limit required; premeditation and deliberation require only a "brief moment of thought" or a "matter of seconds." *Id*. at 242-243 (cleaned up). The jury may infer that a reasonable person had time for a "second look" from the entirety of the case's facts and circumstances. *Id*. at 243-244.

Viewing the entirety of the evidence presented at trial, we conclude that it amply supported the jury's finding of premeditation and deliberation on the part of Harris. Witness testimony placed Harris at the store at the time of the shooting. Earlier that day, Harris texted Blair to ask that she bring him ammunition, and she did so. Harris instructed Ratcliff to drive to the store where the shooting occurred, instead of a closer store. When they arrived at the store, Ratcliff parked next to the victim's truck, and she overheard Harris and Parks whispering in the backseat. Ratcliff saw Parks pass a gun to Harris, at which point he and Parks left the car. Harris was seen briefly entering the store wearing a mask before returning to the parking lot. Sublett subsequently saw Harris with his arm up and extended toward the red truck as gunshots rang out. Similarly, Weston saw a person wearing a mask with his arm up and extended toward the truck as shots rang out. One of the police detectives testified that the ammunition recovered from the parking lot was .25 caliber and that this fits a very small type of handgun that can fit in the palm of one's hand. After the shots rang out, Sublett and Ratcliff both saw Harris run away from the parking lot and across the street. Although no witness saw Harris holding a gun, the jury could infer from these circumstances that Harris was the person who shot and killed the victim. Furthermore, the text messages between Harris and Blair indicated that Harris planned the shooting in advance, when he requested that Blair bring him ammunition, and Blair testified about an ongoing feud between Harris and the victim and suggested that the murder had probably been in retaliation for the prior murder of Harris's cousin.

Viewing this evidence in the light most favorable to the prosecutor, a rational jury could conclude that Harris obtained ammunition on the day of the shooting, sought out the victim at the

store in retaliation for the prior murder, discussed with Parks the victim's murder, and obtained Parks's gun for this purpose. Harris donned a mask, checked inside the store briefly, and went back to the parking lot, at which point he discharged his gun at the victim. Given that a "second look" can require mere seconds of premeditation and deliberation, a rational jury could also have found that Harris and Parks did not know that the victim would be at the store but that, upon seeing him in the red truck, they decided to murder him at that time. Either conclusion would have supported a finding of premeditation and deliberation.

## 2. ADMISSION OF RAP LYRICS

Harris next argues that the trial court erroneously admitted numerous lyrics from a rap song that he allegedly wrote. Harris challenges the admission of these lyrics into evidence on both authenticity and relevancy grounds. This Court has reviewed all of the lyrics admitted into evidence. While we conclude that some of the lyrics were improperly admitted because of irrelevancy and the danger of unfair prejudice, we ultimately conclude that the error was harmless in light of the other untainted evidence arrayed against Harris.

We review for an abuse of discretion a trial court's decision to admit evidence. *People v Mardlin*, 487 Mich 609, 614; 790 NW2d 607 (2010). A court abuses its discretion when its decision is "outside the range of principled outcomes." *People v Musser*, 494 Mich 337, 348; 835 NW2d 319 (2013). But, when "the decision involves a preliminary question of law, which is whether a rule of evidence precludes admissibility," we review the question de novo. *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003).

Evidence must be authenticated before admission. MRE 901(a). This "condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." MRE 901(a). One way this may be done is through "[t]estimony that a matter is what it is claimed to be." MRE 901(b)(1). The proffered evidence "need not tell the whole story of a case, nor need it be free of weakness or doubt. It need only meet the minimum requirements for admissibility." *People v McDade*, 301 Mich App 343, 353; 836 NW2d 266 (2013) (cleaned up).

In the present case, Deputy Wing testified that he found the lyrics in Harris's jail cell. Deputy Wing asked Harris and his cellmate to identify those pieces of property that belonged to each of them. Deputy Wing found the lyrics in a box near Harris's bed, and Harris identified the box as belonging to him. Accordingly, Deputy Wing's testimony sufficiently authenticated the lyrics for admission. See MRE 901(a) and (b)(1). Any further arguments by Harris concerning the author of the lyrics went to the weight of the evidence, not its authenticity.

The fact that evidence has been authenticated does not mean it is necessarily admissible. Only relevant evidence is admissible. MRE 402. Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or misleading the jury." MRE 403. "In this context, prejudice means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contentions, but that cannot be grounds for exclusion." *People v*

*Vasher*, 449 Mich 494, 501; 537 NW2d 168 (1995). Rather, "[u]nfair prejudice may exist where there is a danger that the evidence will be given undue or preemptive weight by the jury or where it would be inequitable to allow use of the evidence." *People v Blackston*, 481 Mich 451, 462; 751 NW2d 408 (2008). Our Supreme Court has explained:

> The weighing of evidence's probative value against its prejudicial effect requires a balancing of several factors, including the necessary time to present the evidence, whether the evidence is needlessly cumulative, how directly probative the evidence is, how necessary the fact to be proven by the evidence is, whether the evidence would mislead the jury, and whether there is an alternative and less potentially harmful way to prove the fact. [*People v Sharpe*, 502 Mich 313, 331-332; 918 NW2d 504 (2018).]

Furthermore, evidence of a defendant's character is generally inadmissible to prove "action in conformity therewith on a particular occasion." MRE 404(a).

In our review of the challenged lyrics, both individually and when viewed together as a whole, we conclude that some were relevant and not unfairly prejudicial. These particular lyrics were relevant because they tended to show that Harris held a grudge against the person who murdered Fuller; that Harris sought out this person; that Harris murdered the victim in retaliation for Fuller's murder; and that Harris attempted to intimidate witnesses to dissuade them from testifying in court. These were facts "of consequence to the determination of the action" and made it "more probable" that Harris committed the instant murder. See MRE 401. Furthermore, their substantial probative value outweighed any unfairly prejudicial value. It is true that, as Harris's counsel argued, there was the danger of the jury stereotyping Harris because rap lyrics might be associated with gangs, violence, and crime. This risk, however, was outweighed by the specific references made by Harris to tracking down Fuller's murderer, killing him, and intimidating witnesses. These particular lyrics provided substantial probative value, and we do not believe that this value was *substantially* outweighed by the risk of unfair prejudice. See MRE 403.

Other lyrics were, however, irrelevant and unfairly prejudicial. These lyrics did nothing to connect Harris to the victim's murder. The lyrics instead connected Harris to unrelated guns, violence, killings, drug use, high-crime areas, and police investigations. Any marginal probative value from these lyrics was substantially outweighed by the risk of unfair prejudice because it risked misleading the jury into convicting Harris based on his portrayal as a violent person who liked guns, liked killing people, was connected to prior police investigations, and potentially used drugs. In addition to the content of these lyrics, the *way* in which these lyrics were written added to the risk for prejudice. The language used was in many instances vulgar and crass, and such language could only raise the risk that the jury might be misled and inflamed against Harris. The trial court abused its discretion in admitting these other lyrics.

This conclusion does not end our analysis, however, because "[p]reserved nonconstitutional errors are subject to harmless-error review under MCL 769.26." *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). The statute provides:

> No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the

jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice. [MCL 769.26.]

A preserved, nonconstitutional error is not "ground[s] for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict." *People v Denson*, 500 Mich 385, 409; 902 NW2d 306 (2017) (cleaned up). The focus must be "on the nature of the error," and this Court must assess its effect "in light of the weight and strength of the untainted evidence." *Id*. at 409-410 (cleaned up). The defendant carries "the burden of establishing a miscarriage of justice under a 'more probable than not' standard." *Thorpe*, 504 Mich at 252 (citation omitted).

As previously discussed, there was ample evidence arrayed against Harris for a jury to convict him of premeditated murder, including numerous witnesses who placed him at the scene with his arm raised and pointed at the victim's truck. Witnesses subsequently saw Harris flee the scene, and police recovered various incriminating text messages. There was evidence of a feud between Harris and the victim, and the admissible lyrics described how Harris sought out the victim in retaliation for the murder of his cousin. In light of the strength of the prosecutor's case, we conclude that Harris has not shown that it is "more probable than not" that a miscarriage of justice occurred, *Thorpe*, 504 Mich at 252 (cleaned up), or that the admission of the lyrics was outcome-determinative, *Denson*, 500 Mich at 409.

## B. DOCKET NO. 346587

In Docket No. 346587, Parks presents five issues on appeal. He argues that his constitutional rights to a speedy trial and to confront witnesses were violated. He contends that the evidence was insufficient for the jury to convict him of aiding and abetting Harris in the shooting. He challenges as unconstitutional the mandatory nature of his life-without-parole sentence. Finally, he contends that the trial court erroneously included the cost of the victim's truck when calculating restitution. We address each argument in turn.

### 1. SPEEDY TRIAL

We review de novo whether a defendant has been denied his constitutional right to a speedy trial. *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999). Both the Michigan Constitution and United States Constitution guarantee the right to a speedy trial. US Const, Am VI; Const 1963, art 1, § 20. These rights are also enforced by statute, MCL 768.1, and court rule, MCR 6.004. "The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006). To determine if a defendant's right to a speedy trial was violated by pretrial delays, Michigan courts apply the four-part balancing test set forth in *Barker v Wingo*, 407 US 514, 530; 92 S Ct 2182; 33 L Ed 2d 101 (1972). *Williams*, 475 Mich at 261-262. These four factors are: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id*. Moreover, a delay of 18 months or more is presumed to be prejudicial, and, at that point, "the burden shifts to the prosecution to show that there was no injury." *Id*. at 262. In other words, "a presumptively prejudicial delay triggers an inquiry into the

other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Id*. (cleaned up).

Parks was incarcerated for approximately 22 months before trial, and the prosecutor concedes that this delay was presumptively prejudicial. The prosecutor contends, however, and we agree, that the remaining factors do not weigh in Parks's favor. Factor two is the reason for the delay, and our review of the record shows that legitimate reasons for this delay existed, including Parks's own conduct. Parks was bound over in January 2017, and trial was initially set for August 2017. The trial was subsequently adjourned several times, first to October 2017 and then to February 27, 2018. The original judge to whom this case was assigned retired from the bench in December 2017. Apart from perhaps the first adjournment to October 2017, it appears from the record that the judge's retirement contributed to these initial delays. A new judge was not appointed to the bench until February 2018, and, when Parks's case was assigned to the new judge on February 12, 2018, there was a backlog of cases that had resulted from the initial judge's retirement. "Although delays inherent in the court system, e.g., docket congestion, are technically attributable to the prosecution, they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *Id*. at 263 (cleaned up).

Furthermore, when Parks appeared before the newly-appointed judge on February 22, 2018, the prosecutor informed the trial court that he and Parks's counsel had been attempting to resolve the case and that various "housekeeping" issues were still being addressed. Parks did not dispute this. This suggests that, even if the prior judge had not retired, trial may have been delayed because of ongoing negotiations between Parks and the prosecutor. Trial was set for April 2018, but it was again delayed to June 2018, at which point Parks filed a motion for bond and speedy trial.[2] At the hearing, however, Parks's counsel stated that there had been ongoing negotiations between himself and the prosecutor attempting to resolve the case. Moreover, Parks's counsel stated that he and the prosecutor would be "continuing our discussions" to "see if we can't resolve this." Again, this suggests that Parks and the prosecutor were actively negotiating and attempting to resolve the case, which would explain why the trial was delayed. Although Parks asserts on appeal that he was not the cause of the delay, his counsel's remarks on the record suggest otherwise. This factor weighs against Parks.

Factor three is the defendant's assertion of the right. Parks failed to advance any speedy-trial argument until late March 2018—14 months after his arrest and incarceration awaiting trial. Before that date, the record is replete with delays and adjournments; yet, there are no indications that Parks voiced any concerns over those delays and adjournments. Rather, as previously discussed, it appears that Parks contributed to this delay through his ongoing negotiations with the prosecutor. This factor weighs against Parks.

Finally, factor four is the prejudice to the defendant. There are two types of prejudice a defendant may receive: "prejudice to his person and prejudice to the defense." *Williams*, 475 Mich

---

[2] Parks had also filed a motion for bond in late March 2018. The trial court denied the motion for bond because of the seriousness of the charges. Moreover, the trial court noted that the trial was set to begin in two weeks.

at 264 (cleaned up). Our Supreme Court held in *Williams* that, although the "defendant suffered considerable personal deprivation by his 19-month incarceration before trial," including claims of "mental anxiety," the "prejudice prong of the *Barker* test may properly weigh against a defendant incarcerated for an even longer period if his defense is not prejudiced by the delay." *Id*. The more important of the two types of prejudice is prejudice to the defense "because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id*. (cleaned up). Parks contends generally that the length of his pretrial incarceration affected his ability to present evidence in the form of the witnesses who testified at trial. The only concrete example that Parks gives is that of Fordham, who was an unavailable witness at trial. Parks fails to demonstrate how the length of his incarceration led to Fordham's unavailability. Parks merely asserts without support that the delay "most likely" caused Fordham to become unavailable. Yet, we note that Fordham's unavailability was caused by his refusal to appear, even after a bench warrant was issued, and his decision to go "on the run" from law enforcement. We believe it unlikely, therefore, that he would have decided to appear for an earlier-scheduled trial. Furthermore, the prosecutor has shown that Fordham's testimony was innocuous and cumulative, and that his absence at trial did not hurt Parks's defense. Reviewing Fordham's preliminary examination testimony, we agree. Fordham largely testified concerning background matters that other witnesses covered in their testimony. He left the car soon after arriving at the store and, accordingly, provided no insight into whether Parks gave a gun to Harris. Fordham was in the store when the shooting occurred and did not witness it. Parks also fails to show how he was prejudiced by Fordham's absence given that Fordham's preliminary examination testimony was read to the jury.

We conclude that, of the four *Barker* factors, only factor one—the length of the delay—weighs in Parks's favor. The remaining three factors weigh against him. Parks's right to a speedy trial was not violated, and reversal is not warranted.

## 2. SUFFICIENCY OF THE EVIDENCE

Next, we address Parks's arguments concerning whether the evidence was sufficient for the jury to find that he aided and abetted Harris in committing first-degree-premeditated murder.

Michigan's aiding and abetting statute, MCL 767.39, provides:

> Every person concerned in the commission of an offense, whether he directly commits the act constituting the offense or procures, counsels, aids, or abets in its commission may hereafter be prosecuted, indicted, tried and on conviction shall be punished as if he had directly committed such offense.

Our Supreme Court has held that, in order for a defendant to be convicted of aiding and abetting, three elements must be proven:

> (1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Robinson*, 475 Mich 1, 6; 715 NW2d 44 (2006) (cleaned up).]

"Under the natural and probable consequences theory, there can be no criminal responsibility for any thing not fairly within the common enterprise, and which might be expected to happen if the occasion should arise for any one to do it." *Id*. at 9 (cleaned up).

Although Parks concedes that Harris shot and killed the victim, he disputes the second and third elements. Regarding the second element, Parks essentially asserts that, because only one witness, Ratcliff, supposedly saw him pass a gun to Harris, this was insufficient evidence in the face of Parks's adamant denials to police. Parks's argument is one of witness credibility and weight of evidence, and "[t]his Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008).

Regarding the third element, Parks argues that the evidence was insufficient to show that, when he supposedly gave the gun to Harris, he had knowledge that Harris was going to use that gun to murder the victim. Ratcliff, however, testified that Parks and Harris remained in the car and whispered to each other until Parks gave Harris a gun. The two men left the car, and Harris told Ratcliff to drive away as soon as they left the car. Shortly thereafter, Harris fired that gun at the victim, who had been parked next to Ratcliff's car. Additionally, Parks told police in an interview that he had known that the victim was in the parking lot and "knew something was up." Parks further told police that he had known that "somebody thought [the victim] had something to do with killing" Harris's cousin. Parks also gave inconsistent statements to police on various matters. From such evidence, a rational jury could find that Parks and Harris planned the murder of the victim in retaliation for the murder of Harris's cousin and that Parks gave the gun to Harris for this express purpose.

### 3. CONFRONTATION CLAUSE

Parks next argues that the admission of Fordham's preliminary-examination testimony violated his constitutional right to confront witnesses against him. He also contends that Fordham was improperly declared to be an unavailable witness under MRE 804.

"The Confrontation Clause is 'primarily a functional right' in which the right to confront and cross-examine witnesses is aimed at truth-seeking and promoting reliability in criminal trials." *People v Nunley*, 491 Mich 686, 697; 821 NW2d 642 (2012) (citation omitted). "[O]ut-of-court testimonial statements are inadmissible unless the declarant appears at trial or the defendant has had a *previous opportunity to cross-examine the declarant*." *Id*. at 698 (emphasis added).

We conclude that Parks waived these claims. "[W]aiver is the intentional relinquishment or abandonment of a known right." *People v Carines*, 460 Mich 750, 762 n 7; 597 NW2d 130 (1999) (cleaned up). During trial, the prosecutor informed the trial court that there were issues in obtaining Fordham's appearance for trial. Parks's counsel advanced the possibility of declaring Fordham to be an unavailable witness and using his preliminary-examination testimony. In fact, Parks's counsel stated that he "want[ed] Fordham's testimony" admitted regardless of whether it was in person or through his preliminary examination. When the prosecutor formally moved for Fordham's declaration as an unavailable witness and for his preliminary examination testimony to be admitted, Parks's counsel stated he was "in full agreement." Through such affirmative actions, Parks waived his arguments regarding the Confrontation Clause and MRE 804(b). "A defendant

may not waive objection to an issue before the trial court and then raise it as an error before this Court. To hold otherwise would allow defendant to harbor error as an appellate parachute." *People v Fetterley*, 229 Mich App 511, 520; 583 NW2d 199 (1998) (citation omitted).

### 4. MANDATORY SENTENCE OF LIFE WITHOUT PAROLE

Parks further contends that his mandatory life without parole sentence for first-degree murder was unconstitutional. This Court reviews constitutional issues de novo. *People v Bosca*, 310 Mich App 1, 56; 871 NW2d 307 (2015).

Parks was 18 years old when he was convicted of first-degree premeditated murder. His arguments are essentially an attack on MCL 750.316, which mandates a sentence of life without parole for adults who commit first-degree murder. See MCL 750.316(1). He contends that mandatory life-without-parole sentences for 18-year-olds violate the Eighth Amendment to the United States Constitution and Article 1, Section 16 of the Michigan Constitution. In support, Parks argues that the principles espoused in *Miller v Alabama*, 567 US 460; 132 S Ct 2455; 183 L Ed 2d 407 (2012), which held that mandatory life-without-parole sentences for *juvenile* offenders are unconstitutional, should also apply equally to 18-year-olds like Parks.

Both the United States Constitution and Michigan Constitution provide protection against cruel and unusual punishment. US Const, Am VIII ("cruel and unusual punishments"; Const 1963, art 1, § 16 ("cruel or unusual punishment"). "Because of its broader language the Michigan prohibition potentially covers a larger group of punishments." *People v Hallak*, 310 Mich App 555, 569; 873 NW2d 811 (2015), rev'd on other grounds 499 Mich 879 (2016). The United States Supreme Court in *Miller* held that a mandatory sentence of life without parole for *juvenile* offenders was unconstitutional and violated the Eighth Amendment to the United States Constitution. *Miller*, 567 US at 479. The Court permitted a sentence of life without parole for juvenile offenders, but it foreclosed the possibility of this sentence being mandatory. *Id*. at 480. The Court had previously stated that

> [d]rawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. [*Roper v Simmons*, 543 US 551, 574; 125 S Ct 1183; 161 L Ed 2d 1 (2005).[3]]

*Miller* did nothing to abolish or change this "line" espoused in *Roper*; in fact, *Miller* thoroughly discussed *Roper* and based its own decision on its principles. See, e.g., *Miller*, 567 US at 466-467, 479-480, 483-484. Contrary to Parks's contentions, *Miller* and *Roper* do not support his position. Moreover, our own Supreme Court has expressly held that a mandatory sentence of life

---

[3] *Roper* abolished the death penalty for juvenile offenders, and it drew the line at 18 years of age. *Roper*, 543 US at 578-579.

without parole for adult offenders does *not* constitute cruel and unusual punishment or cruel or unusual punishment under the United States and Michigan Constitutions, respectively. *People v Hall*, 396 Mich 650, 657-658; 242 NW2d 377 (1976). This Court must follow *Hall* as binding precedent. See *Beasley*, 239 Mich App at 559.[4]

## 5. RESTITUTION

Finally, Parks argues that the victim's red truck was improperly included in the trial court's restitution order. Because Parks failed to object to restitution at sentencing, we review this issue for plain error affecting substantial rights. *Carines*, 460 Mich at 764.

MCL 780.766 provides in relevant part:

(2) Except as provided in subsection (8), when sentencing a defendant convicted of a crime, the court shall order, in addition to or in lieu of any other penalty authorized by law or in addition to any other penalty required by law, that the defendant make full restitution to any victim of the defendant's course of conduct that gives rise to the conviction or to the victim's estate. . . .

(3) If a crime results in damage to or loss or destruction of property of a victim of the crime or results in the seizure or impoundment of property of a victim of the crime, the order of restitution shall require that the defendant do 1 or more of the following, as applicable:

* * *

(b) If return of the property under subdivision (a) is impossible, impractical, or inadequate, pay an amount equal to the greater of subparagraph (*i*) or (*ii*), less the value, determined as of the date the property is returned, of that property or any part of the property that is returned:

(*i*) The fair market value of the property on the date of the damage, loss, or destruction. However, if the fair market value of the property cannot be determined or is impractical to ascertain, then the replacement value of the property shall be utilized in lieu of the fair market value.

(*ii*) The fair market value of the property on the date of sentencing. However, if the fair market value of the property cannot be determined or is impractical to ascertain, then the replacement value of the property shall be utilized in lieu of the fair market value.

---

[4] We recognize that our Supreme Court may choose to review this issue and provide guidance to the bench and bar, in an appeal currently pending before that Court. See *People v Manning*, unpublished order of the Court of Appeals, entered February 21, 2019 (Docket No. 345268), lv pending.

* * *

> (7) If the victim is deceased or dies, the court shall order that the restitution or remaining restitution be made to those entitled to inherit from the victim's estate.

Furthermore, MCL 780.767 provides:

> (1) In determining the amount of restitution to order under section 16, the court shall consider the amount of the loss sustained by any victim as a result of the offense.

> (2) The court may order the probation officer to obtain information pertaining to the amounts of loss described in subsection (1). The probation officer shall include the information collected in the presentence investigation report or in a separate report, as the court directs.

> (3) The court shall disclose to both the defendant and the prosecuting attorney all portions of the presentence or other report pertaining to the matters described in subsection (1).

> (4) Any dispute as to the proper amount or type of restitution shall be resolved by the court by a preponderance of the evidence. The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the prosecuting attorney.

"A restitution amount, if contested, must be proven by a preponderance of the evidence." *People v Byard*, 265 Mich App 510, 513; 696 NW2d 783 (2005).

Parks's and Harris's convictions stemmed from the murder of the victim in which Harris used a gun to shoot at the victim while he was seated inside of the red truck. The evidence at trial showed that the victim, after being shot multiple times, attempted to flee the parking lot in his red truck but crashed into a tree. Accordingly, the prosecutor showed by a preponderance of the evidence that the red truck's crash and damage was a direct result of Harris's and Parks's offenses. See MCL 780.766(2). At sentencing, however, the prosecutor informed the trial court that the victim's mother had verbally indicated the value of the truck, and that the prosecutor did not provide formal documentation of this value. On appeal, the prosecutor concedes that the trial court never received documentation of the truck's value, and stipulates to a remand for determination of the amount of restitution for the vehicle. Accordingly, we remand for the limited purpose of determining the truck's proper value.

## III. CONCLUSION

In Docket No. 346586, we affirm.  In Docket No. 346587, we remand solely to determine the value of the victim's truck for purposes of the restitution order.  In all other respects, we affirm. We do not retain jurisdiction.

/s/ Christopher M. Murray
/s/ Mark J. Cavanagh
/s/ Brock A. Swartzle